**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 22-2175**

———————————

RAYMOND SEFAKOR YAO AZUMAH,

 Petitioner – Appellant,

 v.

UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES;
KIMBERLY J. ZANOTTI; UR JADDOU; ALEJANDRO MAYORKAS,

 Defendants – Appellees.

———————————

Appeal from the United States District Court for the Eastern District of Virginia, at
Alexandria.  Claude M. Hilton, Senior District Judge.  (1:22-cv-00029-CMH-WEF)

———————————

Argued:  December 7, 2023                          Decided:  July 9, 2024

———————————

Before THACKER, HARRIS, and RICHARDSON, Circuit Judges.

———————————

Vacated and remanded by published opinion.  Judge Harris wrote the opinion, in which
Judge Thacker joined.  Judge Richardson wrote a separate opinion concurring in part and
concurring in the judgment.

———————————

**ARGUED:**  Benjamin Ross Winograd, IMMIGRANT & REFUGEE APPELLATE
CENTER, LLC, Alexandria, Virginia, for Appellant.  Carolyn Michaela Wesnousky,
OFFICE OF THE UNITED STATES ATTORNEY, for Appellees.  **ON BRIEF:**  Ava
Cayetano Benach, BENACH COLLOPY LLP, Washington, D.C., for Appellant.  Jessica
D. Aber, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY,
Richmond, Virginia, for Appellees.

PAMELA HARRIS, Circuit Judge:

Raymond Sefakor Yao Azumah, a national and citizen of Ghana, was admitted to the United States as a lawful permanent resident in 2010. When he returned to the United States after a trip to Ghana in 2014, Azumah was deemed inadmissible because of an intervening embezzlement conviction. The government paroled Azumah into the country and commenced removal proceedings against him.

Years later and after his removal proceedings were dismissed, Azumah applied for citizenship. The United States Citizenship and Immigration Services denied his application, reasoning that Azumah was statutorily ineligible because he was not "lawfully admitted for permanent residence" upon his return to the United States in 2014. The district court adopted the government's position and affirmed the denial of Azumah's application.

We cannot agree. As the government concedes, Azumah was in fact "lawfully admitted for permanent residence" at all times relevant to this case – in 2010, in 2014, and when he sought citizenship – because at all those times, he had the status of a legal permanent resident of the United States. That is enough to satisfy the statutory requirement at issue. And we do not read the agency regulation now pressed by the government to impose upon Azumah the additional burden of showing that he was "lawfully admitted" – rather than paroled – when he returned to the United States in 2014. Accordingly, we vacate the judgment of the district court and remand for further proceedings consistent with this opinion.

**I.**

**A.**

For context, we begin with a brief description of the statutory provisions most relevant to this case.

The Constitution vests Congress with the power to establish requirements for naturalization. U.S. Const. art. I, § 8, cl. 4. Under the Immigration and Nationality Act ("INA"), noncitizens must satisfy three primary requirements, set out in 8 U.S.C. §§ 1427 and 1429, to become naturalized citizens. First and most important here, an applicant must have "resided continuously" in the United States for at least five years "after being *lawfully admitted for permanent residence*." 8 U.S.C. § 1427(a)(1) (emphasis added). The requirement of lawful admission for permanent residence is echoed in § 1429, which provides that "no person shall be naturalized unless he has been *lawfully admitted to the United States for permanent residence*," and that the "burden of proof shall be upon such person to show that he entered the United States lawfully." 8 U.S.C. § 1429 (emphasis added). An applicant must also have continuously resided in the United States between the date of his application and the time he is granted citizenship, 8 U.S.C. § 1427(a)(2), and have been of "good moral character" during the five-year period preceding his application, *id.* at § 1427(a)(3).

"Lawfully admitted for permanent residence" is a statutorily defined term, meaning "the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed." 8 U.S.C. § 1101(a)(20). A noncitizen is regarded as having been

"lawfully" admitted for permanent resident status only if he was legally entitled to that status when it was granted. *See Injeti v. USCIS*, 737 F.3d 311, 315-16 (4th Cir. 2013) (affirming agency interpretation of "lawfully" as denoting "compliance with substantive legal requirements, not mere procedural regularity" (internal quotation marks omitted)).

Generally, a noncitizen "lawfully admitted for permanent residence" – or an "LPR" – who returns to the United States from travel abroad is not regarded as "seeking an admission into the United States" for purposes of the immigration laws. 8 U.S.C. § 1101(a)(13)(C). But there are exceptions, and one of them, relevant here, is for noncitizens who have committed "a crime involving moral turpitude." 8 U.S.C. §§ 1101(a)(13)(C)(v), 1182(a)(2)(A)(i)(I). So an LPR returning to this country who has been convicted of a crime involving moral turpitude can be treated as seeking admission, deemed inadmissible, and placed into removal proceedings. *See* 8 U.S.C. §§ 1101(a)(13)(C)(v), 1182(a)(2)(A)(i)(I), 1227(a)(1)(A). And critically, while the LPR may be paroled into the United States at the discretion of the Attorney General, that parole does not constitute an "admission" under the INA. *See* 8 U.S.C. § 1182(d)(5)(A); *see also id.* at 1101(a)(13)(B).

**B.**

In 2010, petitioner Raymond Sefakor Yao Azumah, a Ghanaian citizen, was admitted to the United States as a lawful permanent resident. Two years later, in the summer of 2012, he was arrested for stealing clothes from the Sears Department Store at which he worked, and pleaded guilty to a misdemeanor count of embezzlement of less than $200 under Virginia Code Section 18.2-111. Azumah does not dispute that this conviction

4

was for a "crime involving moral turpitude" that rendered him inadmissible and removable under the INA. *See* 8 U.S.C. §§ 1182(a)(2)(A)(i)(I), 1227(a)(1).

In December 2013, Azumah travelled to Ghana for a month-long visit with family. When he returned to the United States in January 2014, customs agents noted that he appeared to be inadmissible by virtue of his embezzlement conviction. Azumah's inspection was deferred until he could provide certified conviction records, and he was paroled into the country. A month later, Azumah appeared for his inspection, where he was charged as inadmissible based on his embezzlement conviction, served with a Notice to Appear in removal proceedings, and released.

For reasons that are unclear from the record – but might have something to do with the lack of any hearing date on Azumah's Notice to Appear – those removal proceedings never happened. Instead, after a years-long delay, Azumah finally pleaded to the charge of inadmissibility in January 2018, conceding that he had been convicted of a crime involving moral turpitude but seeking to terminate the proceedings to pursue naturalization.[1] Azumah and the Department of Homeland Security then jointly moved to dismiss the proceedings without prejudice, under a provision allowing for discretionary dismissals when removal "is no longer in the best interest of the government." *See* 8 C.F.R.

---

[1] In his motion to terminate removal proceedings, Azumah argued that he was *prima facie* eligible for citizenship because he had resided in the United States as an LPR for more than five years, *see* 8 U.S.C. § 1427(a)(1), and because more than five years had passed since his July 2012 criminal conviction, *see id.* at § 1427(a)(3) (applicant must be of "good moral character" for five-year period preceding application).

§§ 1239.2(c), 239.2(a)(7). An immigration judge granted the motion and dismissed the proceedings without prejudice.

Azumah applied for naturalization in December 2018. The United States Citizenship and Immigration Services ("USCIS") responded with a Notice of Intent to Deny; then a denial of Azumah's application; and finally, in December 2021, a denial of Azumah's administrative appeal. USCIS's basic rationale was consistent across its decisions: Because of his embezzlement conviction, Azumah was treated as an applicant for admission when he returned from his trip abroad in 2014 and deemed inadmissible. *See* 8 U.S.C. §§ 1101(a)(13)(C)(v), 1182(a)(2)(A)(i)(I). It followed, USCIS concluded, that Azumah could not satisfy the statutory requirement that he be "lawfully admitted for permanent residence," *see* 8 U.S.C. § 1427(a)(1), because he was not "lawfully admitted" to the country "upon [his] last entry" in 2014. J.A. 20; *see also Azumah v. USCIS*, No. 1:22-CV-29, 2022 WL 4290466, at *1 (E.D. Va. Sept. 16, 2022) (describing administrative proceedings).

Azumah then filed the instant suit in federal district court, seeking de novo review of his citizenship application. *See* 8 U.S.C. § 1421(c) (authorizing de novo review of citizenship denial and de novo hearing on citizenship application). Azumah and the government each moved for summary judgment and the district court ruled for USCIS, affirming the denial of Azumah's naturalization application. *See Azumah*, 2022 WL 4290466, at *3.

The issue in the case, the district court explained, was the statutory requirement that a citizenship applicant have been "lawfully admitted to the United States for permanent

residence," *id.* at \*2 (quoting 8 U.S.C. § 1429) – and thus, as the district court saw it, whether Azumah could demonstrate "the lawfulness of his admission during his latest [2014] reentry," *id.* The court rejected Azumah's argument that his continuing and "undisputed status as a lawful permanent resident" was enough to satisfy the statutory requirement. *Id.* at \*3. That position, the court believed, was inconsistent with an agency regulation – 8 C.F.R. § 316.2(b) – requiring a "lawful admission" both at first entry to the United States and at "any subsequent reentry." *Id.*; *see id.* at \*2 (quoting 8 C.F.R. § 316.2(b)). Because Azumah had "not met his burden of demonstrating he was lawfully admitted when he last entered this country," the court concluded, his citizenship application was properly denied. *Id.* at \*2.

Azumah filed a timely notice of appeal.

## II.

We review de novo both a decision granting summary judgment and one denying a naturalization application. *Injeti*, 737 F.3d at 315. In our view, the district court erred when it determined that Azumah was ineligible for citizenship because he was not "lawfully admitted" to the United States when he returned in 2014. Accordingly, and without passing on whether Azumah ultimately will prove eligible for naturalization, we vacate the judgment of the district court and remand for further proceedings.

### A.

We begin with the statutory naturalization requirement directly at issue in this case, which appears in both 8 U.S.C. § 1427(a) and 8 U.S.C. § 1429: that an applicant be

"lawfully admitted for permanent residence," § 1427(a), or "lawfully admitted to the United States for permanent residence," § 1429. Both USCIS and the district court understood that requirement to entail lawful *admission* into the United States. But that is incorrect. Perhaps counterintuitively, the phrase "lawfully admitted for permanent residence," as used in the INA, has nothing to do with "admission" at all. Instead, it is a term of art, statutorily defined, that refers not to an applicant's *admittance* but instead to his *status* – the "status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed." 8 U.S.C. § 1101(a)(20).[2]

The government concedes that Azumah, admitted to the United States with LPR status in 2010, retains his LPR status to this day. *See* Brief for Defendants-Appellees at 24 ("agree[ing] that Petitioner maintains his status as a lawful permanent resident"); *Azumah*, 2022 WL 4290466, at *3 (referring to Azumah's "undisputed status as a lawful permanent resident"). That understanding aligns with the law. As we have noted, § 1101(a)(20) does not itself "define the moment at which lawful permanent residence ends." *Nwolise v. U.S. INS*, 4 F.3d 306, 310 (4th Cir. 1993). But agency regulations specify that "[s]uch status terminates upon entry of a final administrative order of exclusion, deportation, or removal." 8 C.F.R. § 1.2. And the longstanding Board of Immigration Appeals position, endorsed by

---

[2] We note that § 1429 – unlike § 1427(a) – adds the words "to the United States" to the relevant phrase. *See* 8 U.S.C. § 1429 (requiring that applicant be "lawfully admitted *to the United States* for permanent residence" (emphasis added)). We do not understand that addition to change the term's meaning, and neither party has argued to the contrary. Accordingly, we treat the two statutory requirements as interchangeable here.

our court, is to the same effect: "[L]awful permanent residence status continues until an order of deportation becomes administratively final, i.e., when the Board [of Immigration Appeals] renders its decision . . . or, where no appeal to the Board is taken, when appeal is waived or the time allotted for appeal has expired." *Nwolise*, 4 F.3d at 311 (cleaned up) (quoting *Matter of Lok*, 18 I. & N. Dec. 101 (BIA 1981)). Azumah *could* have lost his LPR status because of his embezzlement conviction, in other words, had the government successfully prosecuted the contemplated removal proceedings. But it did not, so Azumah was never subject to a final removal order and his LPR status never "changed" within the meaning of § 1101(a)(20).

The upshot is clear. In the administrative proceedings here, USCIS relied on INA provisions requiring a naturalization applicant to be "lawfully admitted for permanent residence," which means that the applicant must have LPR *status*. Azumah satisfies that requirement. As all agree, he was admitted to the country in 2010 with lawfully obtained LPR status; he retained that status when he returned in 2014; and he has LPR status today. The government has effectively conceded now that this statutory requirement does not bar Azumah's naturalization, and it has pointed to no other statutory requirement that does.

**B.**

That leaves the government with its fallback argument: Even if Azumah meets the statutory requirements for naturalization, he is ineligible by virtue of an additional requirement imposed by regulation – specifically, the regulatory subsection at 8 C.F.R. § 316.2(b). Subsection *(a)* of the same regulation does indeed set forth requirements for naturalization, including two that echo the statutory LPR criteria: under § 316.2(a)(2), an

9

applicant must be "lawfully admitted as a permanent resident of the United States," and under § 316.2(a)(3), he must have "resided continuously within the United States . . . for a period of at least five years after having been lawfully admitted for permanent residence." 8 C.F.R. § 316.2(a).  But the government does not rely on those substantive requirements for its argument.  Instead, it points to subsection *(b)*, titled "[b]urden of proof," which states in full:

> The applicant shall bear the burden of establishing by a preponderance of the evidence that he or she meets all of the requirements for naturalization, including that the applicant was *lawfully admitted as a permanent resident to the United States*, in accordance with the immigration laws in effect at the time of the applicant's *initial entry or any subsequent reentry*.

8 C.F.R. § 316.2(b) (emphases added).

This burden-of-proof provision, according to the government, introduces a new requirement into the naturalization scheme.  Under § 316.2(b), the government argues, it is not enough that an applicant has LPR status when he applies for naturalization.  Instead, he must also have been "lawfully admitted" to the country at the time of both his "initial entry [and] any subsequent reentry."  *Cf.* 8 C.F.R. § 316.2(b) (applicant must be "lawfully admitted *as a* permanent resident" in accordance with the laws in effect at the time of "initial entry *or* any subsequent reentry") (emphasis added)).  Because of his embezzlement conviction, recall, Azumah was "regarded as seeking [] admission" when he returned from a brief trip abroad in 2014, *see* 8 U.S.C. § 1101(a)(13)(C)(v), and was then paroled into the country – which does not count as an "admission."  *See* 8 U.S.C. § 1101(a)(13)(A) (defining "admission" as the "lawful entry of [an] alien into the United States after inspection and authorization by an immigration officer"); *see also id.* § 1182(d)(5)(A)

(providing that parole shall not be regarded as admission); *id.* § 1101(a)(13)(B) (same).  It follows, the government concludes, that Azumah was not "admitted" at all in 2014, which makes him ineligible to naturalize under the "subsequent reentry" prong of § 316.2(b).  The district court agreed.  *See Azumah*, 2022 WL 4290466, at *2-3 (finding Azumah ineligible under § 316.2(b) because he cannot demonstrate that he was "lawfully admitted" during his 2014 entry).

We do not think § 316.2(b)'s burden-of-proof provision can bear the government's reading.[3]  To be sure, the provision is not a model of clarity.  But one thing does seem clear:  § 316.2(b) is concerned not with an applicant's *admission*, but with whether he has been "lawfully admitted *as a permanent resident*."  8 C.F.R. § 316.2(b) (emphasis added).  And as discussed above, "lawfully admitted for permanent residence" is a term of art referring not to admission but to LPR status, which all agree Azumah has held at every

---

[3] Our concurring colleague agrees that 8 C.F.R. § 316.2(b) does not bar Azumah's naturalization.  But it gets to that conclusion by a different route, adopting a reading of "entry" that the parties have not advanced – indeed, have expressly disavowed before our court in supplemental briefing – and that the district court had no opportunity to address.  The entry question is a complicated one.  As the government explains in rejecting the concurrence's approach, much of the seminal precedent in this area predates the modern immigration framework ushered in by 1996's Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), or concerns the due process rights of non-citizens.  *See* Conc. Op. at 26 n.13 (explaining complicated relationship between pre-IIRIRA focus on "entry" and post-IIRIRA focus on "admission").  And the status of our discussion of "entry" in *Lopez-Sorto v. Garland*, 103 F.4th 242, 251-52 (4th Cir. 2024) – another case in which the issue was not argued by the parties – already is disputed by Azumah.  *See* Fed. R. App. P. 28(j) Letter at 2, *Azumah v. USCIS*, No. 22-2175 (4th Cir. June 3, 2024), ECF No. 37 (28(j) letter arguing that relevant passage from *Lopez-Sorto* is dicta).  Given the complexities and what could be far-reaching implications, we think it best to decide this case on the grounds argued by the parties and addressed by the district court.

relevant time. To argue the contrary – that Azumah is eligible only if he was "lawfully admitted" on his return in 2014, regardless of his status – the government bisects the phrase "lawfully admitted as a permanent resident" and focuses only on its first half. But read in its entirety, that phrase is clearly intended to reference the substantive requirement of LPR *status* found in Congress's naturalization statutes and subsection *(a)* of the very same regulation.

In resisting this logical conclusion, the government rests almost entirely on one very fine distinction: Section 316.2(b) uses "lawfully admitted *as a* permanent *resident*" and not "lawfully admitted *for* permanent *residence*," as in 8 U.S.C. § 1427(a) and § 1429. We think it most unlikely that an agency would introduce an entirely new naturalization requirement by replacing a "for" with an "as." But in any event, the agency did not do so here. We know that because 8 C.F.R. § 316.2(a) – again, a part of the very same regulation – uses *both* terms to set out the substantive criteria for naturalization, requiring that an applicant be "lawfully admitted as a permanent resident" *and* that he be "lawfully admitted for permanent residence" for at least five years of continuous residence in the United States. 8 C.F.R. § 316.2(a)(2), (3). In § 316.2(a), in other words, the agency obviously intended the two phrases to operate interchangeably, with both denoting the baseline LPR *status* requirement set by statute.

Based purely on text, then, we see no basis for reading into § 316.2(b) a requirement of "lawful admission," separate and apart from Azumah's (undisputed) LPR status.[4] But the government's contrary reading of § 316.2(b) suffers from additional flaws, as well: It is hard to reconcile with the provision's context and regulatory history, and it would raise difficult questions about the agency's authority to add to Congress's statutory naturalization requirements.

The government, again, no longer argues that Azumah fails to meet any statutory requirement for naturalization. Instead, its position is that the regulation at § 316.2(b) imposes an additional requirement – lawful admission upon any entry to the United States – over and above the statutory minimum. If this were so, it would be a very significant matter, and one would expect it to be acknowledged as such. Instead, we have a difficult-to-parse regulation tucked away in a subsection that is devoted not to substantive naturalization requirements – as in subsection (a) of § 316.2 – but to the "[b]urden of proof" in naturalization proceedings. It is perhaps possible that an agency might bury a brand-

---

[4] Because we agree with Azumah's first-order argument that § 316.2(b) imposes no "lawful admission" requirement at all, we need not address his second: that even if § 316.2(b) did require lawful admission, that requirement would pertain only "at the time of the applicant's initial entry *or* any subsequent reentry." *See* 8 C.F.R. § 316.2(b) (emphasis added). Because all agree that Azumah was lawfully admitted on his initial entry in 2010, that is, the government has the unenviable task of arguing that where the regulation says "or," we should read "and." Context matters, of course, *see Pulsifer v. United States*, 144 S. Ct. 718, 726 (2024) (reviewing "text in context" to interpret the word "and" as used in a federal sentencing provision), and the government gamely endeavors to defend that reading. We have our doubts, but again, it does not matter here.

13

new naturalization requirement under the title "Burden of proof," but we would need more in the way of a plain statement before we adopted such a reading.

Nor is there anything in the agency record to indicate an intent to incorporate a new citizenship requirement by way of § 316.2(b).  The Federal Register notices announcing the interim and final versions of the provision are silent regarding a "lawful admission" requirement.  *See* Administrative Naturalization, 56 Fed. Reg. 50475 (Oct. 7, 1991) (interim rule); 58 Fed. Reg. 49905 (Sept. 24, 1993) (interim rule); 60 Fed. Reg. 6647 (Feb. 3, 1995) (final rule).  On the contrary, one of the notices explains that Part 316 "contains the basic elements of statutory eligibility for naturalization" and "does not change essential requirements," with one exception inapplicable to this case.  Administrative Naturalization, 56 Fed. Reg. at 50477.  The only discussion of what is now subsection (b) of § 316.2 concerns, as one might expect, burdens of proof:  the provision is being amended to incorporate the "specific standard of proof upon an applicant for naturalization as established by judicial precedent, namely, preponderance of the evidence."  Administrative Naturalization, 58 Fed. Reg. at 49909.

That is all for the best, for had the agency instead intended to add to or rewrite Congress's substantive naturalization requirements, we would face serious questions about its authority to do so.  The district court, recognizing this issue, suggested that a regulatory "lawful admission" requirement could be a "reasonable interpretation of a statute that stresses the continuous nature of naturalization requirements," citing the five-year continuous residence requirement of 8 U.S.C. § 1427(a).  *Azumah*, 2022 WL 4290466, at *3.  We understand this to be an allusion to *Chevron* deference.  *See Chevron, U.S.A., Inc.*

*v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  But the district court identified no ambiguity in the statutory requirements at issue – which, again, the government has now conceded Azumah satisfies.  And the term "continuously" in 8 U.S.C. § 1427(a) relates only to the time a non-citizen resides in the United States, not to any other aspect of an application for naturalization.  Perhaps for this reason, the government does not defend or even address the district court's *Chevron* analysis.  But it also fails, conspicuously, to ground its purported new naturalization requirement in any other statutory provision.

Instead, the government makes what is essentially an absurdity argument:  Unless we read § 316.2(b) to impose a "lawful admission" requirement, it reasons, non-citizens with LPR status could reenter the country without regard to the immigration laws and with no repercussions for their naturalization applications.  *See* Brief for Defendants-Appellees at 21 ("It simply cannot be the case that Petitioner's failure to be admitted to the United States in 2014 has *no effect* on his eligibility to naturalize.").  That is not the case.  An LPR required to "seek admission" on return to the United States after a trip abroad – as Azumah was, by virtue of his embezzlement conviction – may be deemed inadmissible and face removal.  *See* 8 U.S.C. §§ 1101(a)(13)(C), 1182(a)(2), 1227(a)(1); *see also Vartelas v. Holder*, 566 U.S. 257, 263 (2012) (discussing consequences of "seeking admission").  If an LPR seeking admission is subject to pending removal proceedings, his naturalization application cannot be considered under § 1429's "priority" provision, *see* 8 U.S.C. § 1429, and if he ultimately is subject to a final order of removal, he generally will lose his LPR status and with it his ability to naturalize, *see* 8 C.F.R. § 1.2.  Azumah finds himself in a different posture only because the government chose to terminate his removal proceedings.

In sum, we agree with Azumah that 8 C.F.R. § 316.2(b) does not impose a "lawful admission" requirement that renders him ineligible to naturalize.[5] Nor, as we have explained already, do the statutory provisions identified by USCIS in the administrative proceedings operate as a bar to Azumah's application. The government has disclaimed reliance on any other statute or regulation, at least at this point in the proceedings. Accordingly, we vacate the district court's judgment and remand for proceedings consistent with this opinion.[6]

---

[5] As for what exactly § 316.2(b) *does* mean, we confess that we are at something of a loss. As explained above, the provision's use of "lawfully admitted as a permanent resident" clearly refers to LPR status. But at the same time, and for many of the same reasons given above, we do not understand the provision to require that any applicant for citizenship have LPR status upon *entry* to the country, initial or subsequent – another brand-new naturalization requirement with no statutory basis, and one that would exclude from citizenship the many applicants who adjust their status to LPR only after arriving in the country. *See* Conc. Op. at 21 (noting same problems). Our best guess is that § 316.2(b) is intended as a kind of choice-of-law provision, requiring a citizenship applicant to show that his LPR status was granted in "compliance with [the] substantive legal requirements," *see Injeti*, 737 F.3d at 315, that were "in effect at the time of the applicant's initial entry or any subsequent reentry," 8 C.F.R. § 316.2(b). But that is just a guess, and given the opaqueness of the provision and the paucity of case law interpreting it, the agency may want to take another look.

[6] Again, this does not mean that we approve Azumah's application, and we express no opinion on its ultimate merits. Nor do we express a view as to how the district court should proceed on remand. Instead, we leave it to the parties to argue in the district court whether that court should take further action itself or remand to USCIS for further administrative proceedings. *Compare* 8 U.S.C. § 1421(a) ("The sole authority to naturalize persons as citizens of the United States is conferred upon the Attorney General."), *with id.* § 1421(c) ("[Judicial] review shall be de novo, and the court shall make its own findings of fact and conclusions of law and shall, at the request of the petitioner, conduct a hearing de novo on the application."); *cf. SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) ("[A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency.").

**III.**

For the foregoing reasons, the judgment of the district court is vacated and the case remanded to the district court.

*VACATED AND REMANDED*

RICHARDSON, Circuit Judge, concurring in part and concurring in the judgment:

I am pleased to join the majority opinion in all but Part II.B.  Like my colleagues, I believe that the INA's requirement that an alien must be "lawfully admitted for permanent residence" before he can be naturalized does not currently bar Azumah from naturalizing. I also agree that 8 C.F.R. § 316.2(b) cannot bear the weight either the Government or the district court puts upon it.  And I likewise am at a loss "[a]s for what exactly § 316.2(b) *does* mean."  Maj. Op. at 16 n.5.  Perhaps we will soon find it easier to disregard agency gibberish as gibberish.[7]  But, given where we are, I would respond to that confusion differently:  Rather than deciding which party has the better reading of this confounding regulatory language, I would hold that, even if the district court properly interpreted the regulation, it still erred by determining Azumah is ineligible for naturalization on that ground.

## I.

As the majority notes, the Government argues—and the district court concluded— that Azumah cannot show that he was "lawfully admitted as a permanent resident to the United States, in accordance with the immigration laws in effect at the time of the

---

[7] Within a month of this writing, the Supreme Court will issue opinions in two cases that present the question of whether *Chevron v. Natural Resources Defense Council*, 467 U.S. 837 (1984)—which currently mandates that we give deference to certain statutory interpretations by federal agencies—should be overruled.  *See Loper Bright Enters. v. Raimondo*, 143 S. Ct. 2429 (2023) (mem.); *Relentless, Inc. v. Dep't of Com.*, 144 S. Ct. 325 (2023) (mem.).

applicant's initial entry or any subsequent reentry."  8 C.F.R. § 316.2(b).[8]  And to do so, the Government connects three steps.  First, that § 316.2(b) is the "governing regulation." Defs.-Appellees' Br. at 14.  Second, that the regulation requires that aliens be *admitted* into the country *with* LPR status—as opposed to acquiring that status after admission—before they can naturalize.  This reading, the Government explains, stems from the regulation's use of the phrase "lawfully admitted *as a* permanent resident," not "lawfully admitted *for* permanent residence."  *Compare* 8 C.F.R. § 316.2(b), *with* 8 U.S.C. § 1429 (emphasis added to both).  And third, that the regulation requires applicants to show they were lawfully admitted with LPR status *every time* they entered or reentered the country.

The majority torpedoes this argument at the second step, adopting Azumah's argument that "'lawfully admitted as a permanent resident' necessarily refers to the . . . requirements that applicants be lawfully admitted for permanent residence."  *See* Pet'r's Opening Br. at 35.  If that were the only language in § 316.2(b), I might agree with that solution.  But it isn't.  Instead, the regulation continues, specifying that the applicant for naturalization must prove that he "was lawfully admitted as a permanent resident to the United States, in accordance with the immigration laws in effect at the time of the applicant's initial entry or any subsequent reentry."  8 C.F.R. § 316.2(b).  The majority

---

[8] Before moving on, I encourage the reader to try to make sense of § 316.2(b) (emphasis added):

> Burden of proof. The applicant shall bear the burden of establishing by a preponderance of the evidence that he or she meets all of the requirements for naturalization, including *that the applicant was lawfully admitted as a permanent resident to the United States, in accordance with the immigration laws in effect at the time of the applicant's initial entry or any subsequent reentry.*

largely ignores the subsection's final clause, relegating its discussion of that clause to a footnote where it acknowledges that "the opaqueness of the provision" requires us to give "[o]ur best guess" as to what the agency "intended" the regulation to mean.  Maj. Op. at 16 n.5.

In ruling as it does, the majority endorses Azumah's reading of the regulation and implies that it is a legitimate way to read § 316.2(b).  Yet it cannot be.  For, even if one accepts the majority's position that "lawfully admitted *as a* permanent resident" means "lawfully admitted *for* permanent residence," what could that mean when combined with the provision's final clause?  I see a few possibilities, all of which contradict the text of the INA.

First, one could conclude that the majority's position, plus the "in accordance with" language, means that a naturalization applicant must show that he had *already been granted* LPR status at the time of his "initial entry or any subsequent reentry."  But that position effectively renders naturalization impossible for all those aliens who received LPR status after entering the country—such as those who initially came here on student visas—and who never left after gaining that status.  If so, then the agency has seemingly added the requirement that those aliens must be granted LPR status before entering the country to naturalize.  But the INA itself has no such requirement.  *See* 8 U.S.C. § 1427(a).

Second, one could read the regulation as authorizing the Government to rely on outdated versions of the INA when addressing naturalization applications.  It is possible to read the "in accordance with the immigration laws in effect at the time of the applicant's initial entry or any subsequent reentry" clause as modifying one of two phrases in the

regulation: "that he or she meets all of the requirements for naturalization" or "that the applicant was lawfully admitted as a permanent resident." *See* 8 C.F.R. § 316.2(b). But either reading would seemingly require the Government to look to the old law in effect at the time of the applicant's entry, not current law, to determine what the applicable naturalization requirements are. Yet the INA is clear about what an applicant must show to be eligible for naturalization—and it never mentions past versions of the law in so doing. *See* 8 U.S.C. §§ 1427(a), 1429.

Relatedly, the majority appears to conclude that the provision should be read as telling the Government to look to the law at the time of the alien's admission or entry to determine whether the alien was granted LPR status in compliance with substantive legal norms. *See* Maj. Op. at 16 n.5. In doing so, it appeals to *Injeti v. USCIS*, 737 F.3d 311 (4th Cir. 2013). But *Injeti* is about whether the law authorized granting LPR status "at the time it was granted," *id.* at 315, not whether the INA as it existed at the time of the applicant's *entry* would support LPR status. And again, the terms of the INA never mention outdated or superseded law in describing who is entitled to LPR status. *See, e.g.*, 8 U.S.C. § 1159(b). The statute determines LPR status based on the law that exists when application is made, not the law as it existed when the alien entered the country.

Finally, applicants could read the Court's opinion and, given the considerations just explained, argue that the final clause should effectively be read out of the regulation. In other words, because the ultimate clause presents serious questions about the regulation's validity, one could argue that the best way to harmonize the regulation with the INA would be to conclude that the final clause is gibberish and should be ignored. While this might

sound appealing, ignoring a chunk of the regulation can hardly be considered a reasonable interpretation.  For we must give effect to the words of operative legal texts rather than simply delete confounding language, even if the resulting directive arguably or actually is *ultra vires*.  *Cf. Anderson v. Hancock*, 820 F.3d 670, 674 (4th Cir. 2016); *Glycine & More, Inc. v. United States*, 880 F.3d 1335, 1344 (Fed. Cir. 2018); *Salinas v. United States*, 522 U.S. 52, 59–60 (1997).  Nor should we interpret the meaning of the phrase "lawfully admitted as a permanent resident" stripped of the contextual clause that modifies it.  *See Biden v. Nebraska*, 143 S. Ct. 2355, 2378 (2023) (Barrett, J., concurring) ("To strip a word from its context is to strip that word of its meaning.").

Admittedly, attempting to determine what *is* a reasonable interpretation of § 316.2(b) in light of the INA's requirements may be a fool's errand.  *See* Maj. Op. at 16 n.5.  But by lending credence to the idea that there can be a "right" way to interpret the regulation, the majority takes the first step toward what is surely an unreasonable reading.  With great respect for my colleagues, I cannot join them in that enterprise.


## II.

The solution, in my view, is to avoid blessing any reading of § 316.2(b) and instead hold that the district court legally erred by denying Azumah's application.  We can do so because—even if we assume the district court's interpretation of § 316.2(b) was correct—the regulation does not establish that Azumah is ineligible for naturalization.

As review, the district court adopted the Government's reading of § 316.2(b).  That is, it determined that the regulation means an "applicant for citizenship must not only

demonstrate he was lawfully admitted as a permanent resident 'in accordance with the immigration laws in effect at the time of the applicant's initial entry,' but also at the time of 'any subsequent reentry.'" *Azumah v. USCIS*, No. 1:22-cv-29, 2022 WL 4290466, at *2 (E.D. Va. Sept. 16, 2022) (quoting § 316.2(b)). No one disputes that Azumah was lawfully admitted with LPR status when he first entered in 2010. But, according to the district court, since Azumah cannot show that he was "lawfully admitted" with LPR status when he returned to the United States in 2014, he cannot make the showing required by the regulation. *Id*.

That conclusion only holds water, however, if Azumah's return to the country constituted a "reentry" as that word is used in the immigration context. But it did not.[9]

Recall that Azumah was not admitted into the country in 2014. Instead, the Department of Homeland Security determined that he was likely inadmissible, so it *paroled* him into the country for one month pending a deferred inspection under 8 U.S.C.

---

[9] After we requested supplemental briefing on this question, Azumah argued that we have no discretion to address it because the Government agrees that Azumah "entered" the country when he returned in 2014 and has thus waived the issue. Pet'r's Suppl. Resp. Order at 1–4. That position makes little sense, as the "entry" issue results in the Government *losing* this appeal. Indeed, *Azumah* was the one who first argued that his 2014 return did not constitute an entry. *See* Pet'r's Opening Br. at 40–41. But even so, "we may address a predicate legal question that disposes of this appeal, even if the parties erroneously agree on its answer and dispute only subsequent, dependent issues." *Wideman v. Innovative Fibers LLC*, 100 F.4th 490, 494 n.3 (4th Cir. 2024). For "once an issue or claim is properly before a court, the court is not limited to the particular legal theories advanced by the parties but retains the independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 91 (1991).

§ 1182(d)(5)(A).[10]    Then, after his deferred inspection confirmed that Azumah was inadmissible, the Department served him a Notice to Appear.

The Notice to Appear had a litany of consequences.  One was that it terminated Azumah's initial parole.  *See* 8 C.F.R. § 212.5(e)(2)(i) ("When a charging document is served on the alien, the charging document will constitute written notice of termination of parole, unless otherwise specified.").  Another was that Azumah was subject to mandatory detention.  *See* 8 U.S.C. § 1225(b)(2)(A) ("[I]n the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien *shall be detained* for a proceeding under section 1229a of this title." (emphasis added)); *see also* 8 C.F.R. § 235.3(c)(1) ("[A]ny arriving alien who appears to the inspecting officer to be inadmissible, and who is placed in removal proceedings pursuant to [8 U.S.C. § 1229a] shall be detained in accordance with [8 U.S.C. § 1225(b)].").[11]  But, luckily for Azumah, the regulations grant the Government the discretion to release certain aliens already detained under § 1225(b)(2)(A).  However, the regulation contemplates such release *only* as an exercise of the Attorney General's parole power under 8 U.S.C. § 1182(d)(5)(A).  *See* 8 C.F.R. § 235.3(c)(1) ("Parole of such alien [detained under 8 U.S.C. § 1225(b)] shall

---

[10] For the first time in supplemental briefing, Azumah, relying on *In re Quilantan*, 25 I. & N. Dec. 285, 292–93 (B.I.A. 2010), posits that he was actually admitted into the country in January 2014, even if mistakenly.  This argument is better made in the district court on remand.  *United States v. Gallagher*, 90 F.4th 182, 189 n.1 (4th Cir. 2024).

[11] "An alien present in the United States who has not been admitted or who arrives in the United States . . . shall be deemed for purposes of this chapter an applicant for admission."  8 U.S.C. § 1225(a)(1).  Azumah neatly meets this definition.

24

only be considered in accordance with § 212.5(b) of this chapter."); 8 C.F.R. § 212.5 (citing § 1182 as authority for the Government's power to parole those detained under § 1225). Accordingly, Azumah's release from mandatory detention following his February 2014 deferred inspection counted as *another* parole into the country under 8 U.S.C. § 1182(d)(5)(A).[12]

Parolees maintain a distinct status from those who have been admitted into the country: "An alien who is paroled under section 1182(d)(5) . . . shall not be considered to have been admitted." § 1101(a)(13)(B); *see also* § 1182(d)(5)(A) ("[S]uch parole of such alien shall not be regarded as an admission . . . ."). But more critically for Azumah, parolees are not treated as having "entered"[13] the country, either. *See Lopez-Sorto v. Garland*, 103 F.4th 242, 251-52 (4th Cir. 2024). In *Leng May Ma v. Barber*, the Supreme Court recognized its long tradition of holding that "the detention of an alien in custody pending determination of his admissibility does not legally constitute an entry though the alien is physically within the United States." 357 U.S. 185, 188 (1958). It then considered whether "parole," defined almost identically at that time as it is today, "effects a change in

---

[12] This analysis holds only to those detained under § 1225. *See Jennings v. Rodriguez*, 583 U.S. 281, 303 (2018) (noting that the power to parole those detained under 8 U.S.C. § 1226(a) comes from that subsection itself).

[13] The relationship between "admission" and "entry" is complicated. Before the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), immigration law largely focused on whether immigrants had effected an "entry" into the country, defined as any "coming of an alien into the United States, from a foreign port or place." *Vartelas v. Holder*, 566 U.S. 257, 261 (2012) (quoting 8 U.S.C. § 1101(a)(13) (1988)). IIRIRA changed the regime, making "admission" rather than "entry" the key focus. *Othi v. Holder*, 734 F.3d 259, 264 (4th Cir. 2013). But even though many references to "entry" in the INA were replaced with "admission," that is not categorically true. *See, e.g.*, § 1429.

the alien's legal status." *Id.*  It said no.  *Id.* at 190.  Parolees are treated as though they remain detained at the border.  *Id.* at 189.

In reaching that conclusion, the Court largely relied upon *Kaplan v. Tod*, 267 U.S. 228 (1925).  That case concerned an immigrant's assertion that she was entitled to citizenship since minors "dwelling in the United States" became naturalized when their parents did.  *Id.* at 230 (citing 1 Rev. Stat. § 2172 (1874 ed.)).  The alien, a child, was brought to Ellis Island by her mother to join her father, who had already been legally residing in the country.  *Id.* at 229.  But during her inspection at the border, she was declared "feeble minded," ordered excluded, and detained.  *Id.*  The outbreak of the First World War, however, required suspending that deportation proceeding, and she was paroled into the custody of an immigrant-aid society.  *Id.*; *Leng May Ma*, 357 U.S. at 189.  During this time, her father naturalized, and the alien claimed she was entitled to the same under the statute.  *Kaplan*, 267 U.S. at 229–30.

But the Supreme Court rejected this argument.  It concluded that she "could not have dwelt within the United States" because she was detained at the border.  *Id.* at 230 (quoting *Zartarian v. Billings*, 204 U.S. 170, 175 (1907)).  Though her "prison bounds were enlarged" due to her parole into the country, "[s]he was still in theory of law at the boundary line and had gained no foothold in the United States." *Id.*  Consequently, she could neither "dwell" nor "reside" within the United States, as those words are understood in the immigration statute.  *Id.* (quoting Act of Mar. 2, 1907, ch. 2534, § 5, 34 Stat. 1228, 1229).

26

The Supreme Court has repeatedly reaffirmed the position that aliens physically present in the country as a matter of legislative grace, but who have not been admitted, have not effected an "entry" in the eyes of the law—even when the alien was once an LPR. In *Shaughnessy v. United States ex rel. Mezei*, the Court dealt with an LPR who had left the country and was adjudged excluded upon his attempted return. 345 U.S. 206, 219 (1953) (Jackson, J., dissenting).[14] Despite various efforts to "effect respondent's departure" under the exclusion order, no other country would accept him. *Id.* at 208–09 (majority opinion). "In short, respondent sat on Ellis Island because this country shut him out and others were unwilling to take him in." *Id.* at 209. In deciding whether the alien's physical presence within U.S. borders gave him additional rights beyond those given to any other alien seeking entry, the Court recognized that "aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law." *Id.* at 212. But the Court then concluded that Mezei presented a different situation: "[H]arborage at Ellis Island is not an entry into the United States." *Id.* at 213. Instead, it was an "act of legislative grace" designed to limit the "hardships" that traditional detention "pending

---

[14] Contrary to Azumah's contention, I do not read *Mezei* as saying that the alien in that case had lost his LPR status before he tried to return to the United States or that he never had LPR status in the first place. On the contrary, the Court's discussion of *Kwong Hai Chew v. Colding*, 344 U.S. 590 (1953), shows that the Court saw at least some (though not much) similarity between the two cases—*i.e.*, they both involved "lawful resident alien[s]." *Mezei*, 345 U.S. at 213. Indeed, Justice Robert Jackson expressly noted that Mezei was "a lawful and law-abiding inhabitant of our country for a quarter of a century, long ago admitted for permanent residence, who seeks to return home." *Id.* at 219 (Jackson, J., dissenting).

determination of their admissibility" imposes on aliens. *Id.* at 215. "And this Court has long considered such temporary arrangements as not affecting an alien's status; he is treated as if stopped at the border" upon his return to the United States. *Id.*; *see also id.* at 213 ("For purposes of the immigration laws, moreover, the legal incidents of an alien's entry remain unaltered whether he has been here once before or not. He is an entering alien just the same, and may be excluded if unqualified for admission under existing immigration laws.").

The Supreme Court has held fast to this line. Even following IIRIRA, it has noted that "[t]he distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (citing *Kaplan*, 267 U.S. 228; *Leng May Ma*, 357 U.S. 185). And as recently as 2020, the Court reiterated that we treat arriving aliens, "even those paroled elsewhere in the country for years pending removal[,] . . . as if stopped at the border." *DHS v. Thuraissigiam*, 591 U.S. 103, 139 (2020) (quoting *Mezei*, 345 U.S. at 215).[15]

---

[15] Considering the Supreme Court's continued adherence to its "entry" precedents, Azumah's argument that IIRIRA implicitly abrogated them falls flat. Specifically, he argues that they are untenable in light of current portions of the INA which refer to paroled aliens as being physically present in the United States. *See, e.g.*, 8 U.S.C. § 1182(a)(6)(A)(i), (a)(9)(B)(ii). But recognizing the fact that parolees are physically present within the country is not to say that they have effected an "entry" as that word has been used as a term of art in the immigration context. The "entry fiction" is about just that—entry—not physical presence. This explains why the identified statutory text refers to aliens "*present* in the United States without being admitted or paroled," § 1182(a)(6)(A)(i) (emphasis added), instead of those who *entered* the United States under such circumstances. Azumah points us to no provisions in the INA that refer to parolees as having effected an entry.

These cases control whether Azumah's parole into the country in 2014 constituted an "entry" as that word is used in the immigration context.  Azumah was paroled into the country at both his initial return and his deferred inspection.  That status has never changed,[16] and Azumah thus did not "enter" the country in 2014.  It is as though he has been "stopped at the border" for the past ten years.  *See Mezei*, 345 U.S. at 215.

The inevitable consequence is that, since Azumah did not "enter" the country in 2014, he did not need to prove that he was "lawfully admitted as a permanent resident to the United States" at that time.  *See* 8 C.F.R. § 316.2(b).  Thus, even if we assume the district court properly interpreted the regulation, it does not bar Azumah's application for naturalization.

For these reasons, I agree to vacate the district court's denial of Azumah's naturalization application and remand for further proceedings.

---

[16] Azumah contends that termination of his removal proceedings in 2018 morphed his parole into admission.  But Azumah's argument misses the fact he committed a crime involving moral turpitude, which "categorically excluded [him] from claiming" that he did not need to seek readmission.  *Othi*, 734 F.3d at 267.  And since this is a "categorical[]" exclusion, the Government has no discretion to ignore it.  *Id.*  The Government might have to prove that Azumah committed a crime before it can *remove* him, *see In re Rivens*, 25 I. & N. Dec. 623, 625 (B.I.A. 2011); *In re Fernandez Taveras*, 25 I. & N. Dec. 834, 836 (B.I.A. 2012), but whether Azumah needed to apply for readmission—and thus is currently an applicant for admission—depends on his past conduct, not on adjudication in a removal proceeding, *Othi*, 734 F.3d at 267.  The termination of removal proceedings, therefore, does not affect whether Azumah needed to be admitted in 2014, whether he was admitted in 2014, or whether he maintains his status as a parolee today.